The next case today is Jesse Aronstein v. Mass. Mutual Life Insurance, Appeal No. 20-2103 and Jesse Aronstein v. Mass. Mutual Life Insurance, Appeal No. 20-2135. Attorney Love, please introduce yourself for the record and proceed with your argument. Good morning again. May it please the Court, my name is Kevin Love. I represent the appellant, Cross Applee, Jesse Aronstein, and the proposed class. Judge Howard, I'd like to reserve three minutes for rebuttal, please. Yes. Thank you. So if it pleases the Court, I'd like to address a couple points in connection with our appeal of the denial of our motion for class certification. My first point is that Mass. Mutual admits that the Odyssey annuity is identical in every respect, in every relevant way for every class member. Thus, the Odyssey is a standardized form contract, and there's no issue about that. My second point that I'd like to highlight is that when Mass. Mutual decided that it wanted to change the minimum guaranteed interest rate for its Odyssey annuity from 3% to 1.5%, that it had a choice. The project team that Mass. Mutual put together came up with two options. The first option was just to simply change the 3 to 1.5 on the certificate schedule. The other option that it came up with was that it would leave the 3% on the certificate schedule while adding an endorsement at the back of the policy. Now, in a number of states during the class period, Mass. Mutual did, in fact, use the certificate option, and that is change the rate from 3 to 1.5 on the certificate schedule. And that's not surprising because the project team, in reviewing the pros and cons of these two options, had found that the changing of it on the certificate schedule would be, quote, straightforward to its customers. But in New York, for some 2,200 unlucky customers, Mass. Mutual left the 3% on the certificate schedule while adding the endorsement at the end of the policy. And this is very surprising because Mass. Mutual had already decided, the same project team had already decided that going about changing the MGIR in this way would be, quote, confusing to its customers. And it's not like Mass. Mutual could not have changed it in New York because the day after the class period ends, Mass. Mutual began selling the Odyssey, the same exact Odyssey, with a 1.5% rate by putting the 1.5 on the certificate schedule with no endorsement. The third point that I'd like to highlight is that the district court clearly erred when it denied class certification in this case because it failed to make an ERIE prediction. Counsel, I don't think that's fair to the district court. The district court didn't fail to make an ERIE prediction. The district court, as I read its opinion, in effect predicted that New York wasn't about to change its settled law in favor of a new theory, which the New York Court of Appeals could adopt, but which would require a change in what is previously settled New York case law. And that's perfectly consistent with the cases that we have that say that where, as in this case, if it chooses a federal forum in preference to an available state forum in a diversity case, he can't expect us to blaze new trails in state law. Different if the area is completely open in state law, different if it is unsettled, but here there is New York case law and New York has never adopted or given any indication that it would adopt the position for which you are advocating. I understand the latest version of the restatement endorses that position. That's good authority and may prove persuasive to the New York Court of Appeals, but I'm struggling with the notion that a federal district court should make that decision for the New York Court of Appeals. I respectfully disagree, Judge Selya, and I'm basing that on your own opinion in Butler, that a district court judge, that it's not a valid excuse for a district court judge to point out that there's no case on a specific issue from the highest court of that state and to throw up its hands and say, I'm not going to do any analysis. Now, in this case, for the restatement rule, we put forth facts that of the courts to have addressed this, at least seven states have adopted it. Several federal courts have adopted it, including this court in Colby. We also pointed out that in the Morrissey case and the Dos Galapagos case, well, we didn't put that out except in the appeal, but the Morrissey case down below. And then we pointed out that New York had already made many exceptions to this general rule regarding extrinsic evidence. And the most important point, Judge Selya, is that the district court didn't address any of this. And to your point that this would be extending the law, there's no dispute that the New York Court of Appeals has never addressed this issue. So when you have a court that has not addressed the issue, your case in Butler and other cases in the circuit say, you have to address the available sources. That's all we asked. And instead, what the district court did was cite Markham v. Fay, which in fact did make an eerie prediction. But what the district court did was he took one line out of that, which was sort of a post hoc rationalization of the ultimate holding in that case, when they decided not to expand the law, to say that we've decided not to extend the law. But that was because the available sources supported that. I believe, Judge Selya, if you look at the district court's opinion, you will not see any kind of analysis. I understand that, but I'm not sure what kind of analysis. I know what a district court should look at, but we've never said the district court has to be explicit. If a district court looks at a situation and says, state law in this area seems pretty clear, they're arguing for an extension of it. That's not for a federal court to speculate that they'll make that kind of extension. There's no indication in the New York cases that they'll go in that direction. And then simply issues a one line decision. And I don't concede that's what Judge Mastriani did here. But I think we then have to look at the merits of the decision and see if there's a reasonable basis for the judge having taken that position. Having taken the position that he won't try to make new New York law. And I suggest to you that from what I know, and I grant you my knowledge is only preliminary at this point, but from what I know about this issue at this time, I'm not at all sure that that is a reasonable way for him to have approached the issue. What I was objecting to was your assumption that because there's no explicit analysis, it means that he refused to make any prediction. Because I don't think that's fair to the district court. Counsel, if I could urge you to move on to the merits issue as to the individual plaintiff. MassMutual argues rather strongly that even though it chose to use an endorsement here to alter the rate paid on the annuity, that it was clear and unambiguous and that the documentation along with the original certificate made it perfectly clear you had to look at endorsements. I would appreciate it if you would spend a few minutes on that. Absolutely, Your Honor. As to the ambiguity ruling, which is the issue on the cross appeal, the question is whether there's a reasonable basis for a difference of opinion. The district court looked at this issue twice and both times found that the minimum guaranteed interest rate was ambiguous. The reason was because in these unique circumstances, MassMutual took a policy that had already been drafted and tried to modify the minimum guaranteed interest rate. What the district court found both times was that this particular contract was not drafted in a manner that would allow for the minimum guaranteed interest rate to be modified by way of endorsement. The reason for that is because the type of language that was used, we have not seen this in any cases that have been cited in the briefs. The certificate schedule said the minimum guaranteed interest rate shall quote never be less than the rate shown on the schedule and that was 3%. And then in the definition section, MassMutual promised, excuse me, guaranteed the customer that the interest rate quote will not be less than the rate on the certificate schedule. Then you get to the endorsement, I'm sorry, and plus the annuity tables that were in the body used a minimum guaranteed interest rate of 3%. So you have all of this on one side. MassMutual then argues that there was an endorsement that was put at the end of the policy. But of course, an endorsement has to be conspicuous for it to have any effect. And as the district court pointed out, there was no notice of this endorsement in the policy. The table of contents didn't name it. There was no separate piece of paper on top that would give notice of the endorsement. And most importantly, the endorsement was misnamed. It was called the guaranteed interest rate endorsement, not the minimum guaranteed interest rate endorsement. So to the extent that somebody might be interested in that issue, they wouldn't know that that endorsement had anything to do with that rate. In particular, the district court found that the Odyssey had other interest rates, current interest rates that were guaranteed, and that therefore a reasonable customer might think that that endorsement had something to do with that. And I would like to point out, Your Honor, to the court, that MassMutual thought it would cause such confusion, the misnaming of the endorsement, that in its own internal documents, it changed the name of the endorsement throughout so that its employees wouldn't be confused between the rates, but yet didn't do it in the Odyssey itself. So we believe the district court had ample reason and support to find that there might be a reasonable basis for a difference of opinion as to the minimum guaranteed interest rate. Yes, thank you. I believe you've reserved some time. If there are no further questions. Thank you, Mr. Love. If you would mute your audio and video, we'll hear from Mr. Mattson. Good morning, and may it please the court. Eric Mattson on behalf of the defendant, MassMutual. Let me begin by talking about the ambiguity question. And that question, respectfully, is resolved by the endorsement on its standalone page toward the end of the policy. It says a couple things that are both taken together, critically important, and eliminate any possible ambiguity. It says, first of all, that the endorsement modifies the contract to which it's attached, and in case of a conflict with any provision in the contract, the provisions of this endorsement will control. It then goes on to say that the contract is modified as follows. The minimum guaranteed interest rate has been changed to 1.5%. Now, it's our view that anybody who read those words, anybody who read the contract from beginning to end, as New York presumes, people who buy, who enter into contracts to do, would read that and understand without a shred of doubt that the minimum guaranteed interest rate in this contract was, in fact, 1.5%. Mr. Mattson, just based on your argument, I've come to the realization that the endorsement did not say there is a conflict between the rate in the certificate and the rate in this endorsement. It merely refers to a modification. Is that correct? It says the contract is modified as follows. Yes, but it does not say, excuse me, it does not say there is a conflict between the rate in the certificate and the rate in the endorsement. Okay, now can we please go back and deal with the argument about the ambiguity as to the title of the endorsement, please? Sure, if there were any ambiguity in the title of the endorsement. Is there any doubt about that? Of course there's ambiguity. Does the title say minimum guaranteed interest rate? The title says guaranteed interest rate endorsement. And there are other guaranteed interest rates apart from the minimum guarantee. There are not other guaranteed interest rates. Sure, there's a guarantee of a 4% interest rate for the first year, isn't there? That's true, Your Honor. I stand corrected about that point. But New York presumes that people read the entire contract and when you read the minimum guaranteed interest rate, the exact terminology that we're debating here this morning has been changed to 1.5%. But if you read this entire contract, what you wind up with is two flatly conflicting things. You wind up with annuity tables, all of which are computed at 3%, several statements in the policy that the 3% interest rate is guaranteed and will never be changed. And then you wind up with an endorsement that purports to change it. And it seems to me that that type of express contradiction is the very definition of ambiguity and is probably the explanation why your internal team found this proposed method of change likely to confuse the consumer. I would agree with you, Your Honor, except for one thing. It's a dispositive thing. And that is that the very endorsement that we're discussing says, in case of a conflict with any provision in the contract, anything, anywhere in the contract, in case of any conflict with any provision in the contract, the provisions of this endorsement, which changes the rate to 1.5%, will control. But you still have a provision earlier in the contract that says the rate is guaranteed and can never be changed. So which am I to believe? You should believe and read the endorsement. Excuse me. Particularly when the company's sales agent has told me, when he was pitching the policy to me, that the rate was guaranteed at 3% for the life of the contract. Well, you don't look to that, Your Honor, that sort of evidence, Your Honor, unless you conclude in the first instance that the contract is ambiguous. Right? So I think we need to set that aside for the moment. It comes into play in the class certification analysis if there is a finding that the contract is ambiguous. And if I may, I don't want to leave. So what's the rule of law you're arguing for? It doesn't matter how confusing or elliptical you make an amendment to a document, so long as you put somewhere in the fine print that this amendment will control regardless. Then it can be totally and completely misleading. It can be intentionally calculated to be misleading. But if you've got that safe harbor statement in, you're not subject to a claim of ambiguity. Is that the rule that you're advocating for? Of course, Your Honor. I would not state it the way you just stated it. No, but that's the net result of the argument you're making. Ignore everything else we've told you. Ignore the strong language that we've used about this interest rate can never be changed. And pay attention to this fine print that says, if there's a conflict, this piece of paper at the end is going to control it. What I would push back on, respectfully, Your Honor, is that it's not in fine print. It's on a standalone page in regular size font. The key language is set apart from the rest of the text. It's quite clear. It's not buried in fine print. It's not hard to find. It's not hidden. If all of that is true, why does your program team call it likely to confuse the consumer? I'm not saying, Your Honor, it's the optimal, the best way to do this. I'm saying that it's not an ambiguous way to do this. I'm just curious. You followed the advice of your program team, apparently, in a number of states and did not choose to make this quite radical change in interest rate. In fact, it's half, right, by endorsement. But in New York State, apparently, consumers there were thought to be different than consumers elsewhere. And you chose to do it not by changing the certificate but by the endorsement. So I'm kind of struggling as to the company's defense here. Sure. Let me address that, Your Honor. My understanding, and you have to do a little inferring here because it was 15, 20 years ago when this happened. But my understanding is that New York regulatory challenges made it cumbersome to change it the way it was done in other states. And, of course, the New York Department of Insurance approved the very way that MassMutual changed this endorsement. I think it's also important, if I may segue to the class certification issue that's before the court as well, it's important to understand how these contracts are sold in the marketplace. Because it's not as though somebody comes into a bank or an agent's office and is handed the contract and is asked if they want to buy the contract. What happens instead is that the potential customer sits down with somebody who can sell this product or perhaps other products and talks about what they're looking for. That did apparently happen with Mr. Arenstein in an unfortunate way. But the unrebutted evidence is that Mr. Arenstein was highly unusual, if not unique, in the clearly unfortunate experience that he had. The evidence showed that what MassMutual did is it informed the people who sold this product of the forthcoming change and that people who bought this product were told up front, before they even saw this contract that we've been debating and discussing this morning, that the minimum guaranteed interest rate was 1.5%. That is an undisputed fact that the overwhelming majority of people in this putative class knew that they were getting a 1.5% product and understood that they were getting a 1.5% product. Mr. Arenstein, regrettably, is a unicorn. He had, as far as we can tell from the overall record in this case, a truly unique experience. I haven't seen evidence that it was intentionally deceptive. He had the misfortune of coming in to see somebody about this product at the end of one year, just before the interest rate was changed, and then didn't buy the product then, came back a few weeks later after the change of the year and the change of the interest rate, and I have no basis to dispute that he was not told of that change. I do have a basis to say, because it's based on actual evidence, that if not everybody, then virtually everybody else in this putative class had a very different experience and got exactly what they bargained for, a product with a 1.5% minimum guarantee. You know, counsel, what's ironic about your argument is you tell us, as to the question of ambiguity, we cannot consider what this authorized sale agent said, but in order to defeat class certification, you are urging us to consider the fact that he was in a different situation as a result of what your authorized sale agent said. Respectfully, Your Honor, I don't view that as ironic at all. There's a two-step analysis here. There's an analysis of the four corners of the complaint, excuse me, of the contract, and the question there is, is it ambiguous? If it's unambiguous, then the appeal is over and judgment is entered in favor of mass mutual. If it's ambiguous, then New York law says you must, the court must, consider extrinsic evidence, like the unfortunate experience that Mr. Ehrenstein had or that others had when they bought their separate policies. Okay, so you're being consistent. Assuming we accept that the contract is ambiguous, then the extrinsic evidence can be used to defeat the class certification. It can't, not only can, it must, and in fact, it would, I can hear from the court's questions, concern about how this contract was constructed. I understand that, but it would be the height of unfairness for somebody who understood they were getting a 1.5% contract. Maybe they even read the endorsement. Maybe their agent went over the endorsement with them and said, hey, this is a 1.5% contract. It would be the height of unfairness for that person to obtain a 3% guarantee when they got the 1.5% guarantee, and that was exactly what they expected, exactly what they bargained for, exactly what they understood they were getting. And that's what plaintiff is arguing for in seeking certification of a class. Thank you. Thank you. I've got it. Okay. I would wager I'm towards the end of my time here. I'd be happy to answer any other questions, but I appreciate the court's time and consideration. Thank you. You would go ahead and mute. Mr. Love, you're reserved a little bit of time. Thank you, Your Honor. I have two points that I'd like to make. The first point goes to the last thing that was discussed about the communication plan. It's important to note that that plan was common evidence. In other words, everything about that plan was to tell Mass Mutual's agents to tell the customers there was 1.5. Albeit it's not favorable for us, but it is common evidence. And under the restatements rule, the test for determining how to interpret an ambiguity is an objective one. It's the average reasonable consumer. So if the class is certified and we go back to trial, Mass Mutual may bring in the evidence of its communication plan, while we bring in evidence of how the odyssey was designed. And then the fact finder would decide what the average reasonable consumer would think the term meant. And that's how it works. So it's not the height of unfairness. And more importantly, subjective understanding is irrelevant under the test, under the restatements test, because it's objective. So what certain people might think is irrelevant. And that's exactly what the district court found to find the class should not be certified, that he would have to look at the subjective understanding of each class member. That is made irrelevant under the objective test of the restatements rule. I'm sorry, I didn't actually understand it that way. I understood the district court is saying, well, given the ambiguity, we have to look at all of the other information that was provided. And when we do that, we find that, in fact, there was not commonality, because some people got explicit verbal assurances, or perhaps in writing from the agents, and others did not. Now, as I'm reading from the opinion, defendant is titled to pursue its defense that individual class members knew about the 1.5%. Under the restatements rule, it's not important what each class member thought it meant or understood it meant, because under the rule, it's an objective test. The restatement rule has not been adopted yet by the New York courts. Yes, Your Honor. If I may just finish that point, is that in Colby, Judge Lynch, you held that even though Colby had a meaning of the term that varied from everybody else, that it was irrelevant under the restatement rule that was adopted in that case. Getting to your question, Judge Salia, I'd like to point out that if you look at the cases that this court has extended the law or made an exception to a rule, you'll find that it's an extensive analysis. If you look at the district court order, it's one paragraph. In one paragraph, that judge did not mention that any of the courts that have adopted it didn't mention Colby, didn't mention the New York cases that I cited. To your earlier question of that we should assume that the district court made some analysis, I think the... No, I didn't say we should assume that. I said there is no requirement for the district court to make its analysis explicit. If its bottom line conclusion is supportable when we do the requisite analysis and apply the appropriate standard of review, that's the end of the matter. There's no requirement for explicit findings of the sort that you're urging. I guess it's six afters of the other because it's a question that's reviewed de novo. So this court's going to look at it anyway. You're going to look at the available sources like you have done. So I won't belabor that point. Thank you. Yeah, if there are no further questions... No, very good. Thank you, counsel. Thank you both. That'll conclude this case.